UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL BINDNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17 CV 889 DDN |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This action is before the court for judicial review of the final decision of the Commissioner of Social Security finding that plaintiff Paul D. Bindner is not disabled and, thus, not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

**I.      BACKGROUND**

Plaintiff was born on March 14, 1989. (Tr. 65). Plaintiff filed an application for DIB on November 7, 2015, when he was 26 years old, alleging an onset date of August 11, 2015.[1] (Tr. 129-31, 211). Plaintiff alleges that he suffers from major depressive disorder with residuals of a traumatic brain injury, sleep apnea, left shoulder strain, lumbar spine strain, right knee strain with bursitis and tendonitis, and tinnitus. (Tr. 202). Plaintiff's application was denied on December 28, 2015, and he requested a hearing

---

[1] To be entitled to DIB, plaintiff has the burden to show disability after his alleged onset date but prior to the expiration of his insured status on December 31, 2019. (Tr. 65). *See* 20 C.F.R. § 404.130; *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009).

before an administrative law judge ("ALJ"). (Tr. 78-85). A hearing was held in June 2016, where plaintiff, a vocational expert ("VE"), and a witness testified. (Tr. 28-64). By decision dated July 29, 2016, the ALJ found that plaintiff was not disabled under the Social Security Act. (Tr. 14-23). The ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform jobs available in significant numbers in the national economy. *Id.*

On February 15, 2017, the Appeals Council of the Social Security Administration denied plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner to be reviewed in this case. (Tr. 1-5). Plaintiff argues that the ALJ's decision is not supported by substantial evidence. (Doc. 18). He asks that the ALJ's decision be reversed and an award of benefits entered or that the case be remanded for further proceedings.

A.      **Medical Record and Evidentiary Hearing**

Relevant to the issues before the court are the following facts. Plaintiff served on active duty with the United States Air Force from 2009 through November 2015, when he was medically discharged. (Tr. 202-03). Plaintiff underwent counseling from October 2014 through August 2015, at which time the Air Force placed him on convalescence leave, and then again from January through June 2016. (Tr. 36, 501, 911, 916, 924, 941, 944). The majority of his treatment records predate his alleged onset date of August 11, 2015.

On October 8, 2014, plaintiff self-referred to an Air Force medical clinic "for depression associated with high job dissatisfaction." (Tr. 951). He met with Joseph C. Stankus, Ph.D., a licensed clinical psychologist, and stated he was unhappy at his job in finance and preferred to work with his hands in "wide-open spaces." (Tr. 951). Dr. Stankus observed that plaintiff had a limited affect, but was otherwise normal with a good prognosis. (Tr. 951-57). Dr. Stankus diagnosed plaintiff with problems related to employment and ruled out adjustment disorder with depressed mood. (Tr. 954). He

determined that plaintiff did not need any alterations to duty status and was fit for continued military service. (Tr. 957).

At subsequent sessions, from October 2014 to March 2015, then again in July and August 2015, plaintiff repeated his discouragement at having to do a job "he basically hates," low morale about his job, and his desire to get out of the Air Force. (Tr. 958, 971, 976, 980, 996, 1007, 1011, 1017, 1026, 1033, 1039, 1064, 1214, 1226).

On November 17, 2014, plaintiff informed Wenjing Cao, PMHAPN-BC, a psychiatric nurse practitioner, that he only took medication to help him cope with work and he planned to stop taking it when he went on vacation to visit his farm. (Tr. 992). On December 8, 2014, he reported to Nurse Cao that he stopped his medications during his two week vacation and "had a good time during his visit, worked outdoors, fixed his jeep, cut firewood, shot some targets, did pretty much the things he planned." (Tr. 1002). When he returned, he reported he would try medication again to cope with his job stressors. (Tr. 1002).

In March 2015, plaintiff reported trouble keeping his continuous positive airway pressure ("CPAP") mask on, and he was "strongly urged" to keep trying anyway, because he could not become accustomed to it unless he wore it consistently. (Tr. 695).

On June 3, 2015, plaintiff met with Dr. Stankus and reported that once he left the service, he wanted to spend 6 to 12 months on his farm doing various repairs on fences, the barn, and the house. (Tr. 616).

On June 22, 2015, plaintiff reported to Kurt R. Guindon, M.D., that his Klonopin medication was "spot on," leaving him relatively anxiety-free, centered, and functional. (Tr. 576). Dr. Guindon urged him to try his CPAP now that he had this medication, as it might help him better tolerate the mask. (Tr. 576). The following day, plaintiff reported to Dr. Stankus that his sleep had improved and he was getting 6 to 7 hours of sleep a night. (Tr. 574). One week later, plaintiff stated his sleep had improved but was still fitful. (Tr. 571). Dr. Guindon noted that plaintiff "bucked" off the CPAP at night, had markedly interrupted sleep, and did not feel rested during the day. (Tr. 507, 521, 547,

3

556, 578). He diagnosed plaintiff with sleep onset myoclonus and insomnia. (Tr. 508, 522, 535, 557, 579).

On July 6, 2015, Dr. Guindon noted that plaintiff had a case of severe anxiety that he believed met the threshold for generalized anxiety disorder. (Tr. 554). Dr. Guindon opined that plaintiff's anxiety disorder would require second generation antipsychotics and benzodiazepines. (Tr. 554). Dr. Guindon increased the Klonopin and another drug and discontinued a third drug. (Tr. 554). Dr. Guindon also opined that plaintiff had elements of post-traumatic stress disorder, in that he re-experiences events, has extreme hypervigilance, has arousal and reactivity, and has anger and irritability. (Tr. 557).

On July 7, 2015, in response to a medical benefits questionnaire, plaintiff reported trouble with his CPAP machine. (Tr. 325). He reported that he had difficulty keeping it in place and had not had a full night of sleep with it in place, so he continued to experience some symptoms of daytime sleepiness associated with his upper airway resistance syndrome/sleep apnea. (Tr. 334).

On July 9, 2015, plaintiff complained that the Klonopin was now making him feel drowsy and unable to stay alert. (Tr. 552). Dr. Guindon reduced the dosage, stating that they were "struggling to find the window between sedation and reasonable anxiolysis." (Tr. 552).

On July 16, 2015, plaintiff reported that his girlfriend had left for two weeks of temporary duty and that he could not stop crying at work that day. (Tr. 542). On July 20, 2015, he reported that he continued to miss his girlfriend, but he was trying to cope by "keeping busy," including cleaning the house and repairing and detailing his girlfriend's car. (Tr. 540-42). He reported that he continued to miss his girlfriend, but his crying spells had reduced to one time per day. (Tr. 540). He remained quite depressed at night and sleep remained problematic. (Tr. 540).

On July 28, 2015, plaintiff called Dr. Guindon to report severe anxiety and that the medication was wearing off in the afternoon, causing agitation. (Tr. 526). Dr. Guindon made some adjustments in his medication plan and instructed him to come in the next day. (Tr. 526).

On August 10, 2015, plaintiff reported becoming more irritable and "rageful" and that he had difficulty going out in public. (Tr. 514). He stated the only time he felt reasonably calm was at home. (Tr. 514). Dr. Stankus suggested the possibility of inpatient hospitalization, but plaintiff declined because he did not want to be separated from his girlfriend. (Tr. 514).

Following his alleged onset date, on August 17, 2015, Dr. Guindon confirmed diagnoses of generalized anxiety disorder, major depression, and adjustment disorder with anxiety and depressed mood, and intended to extend plaintiff's convalescence leave. (Tr. 511). He noted plaintiff was experiencing anxiety with profound and detailed worry, panic, some increase in anger and irritability, obsessive-compulsive disorder, some disillusionment, PTSD, and demoralization. (Tr. 507-08). However, Dr. Guindon also opined that Valium was working much better than Klonopin, and that plaintiff's anger had considerably improved. (Tr. 505). Plaintiff reported that he was working from home and "much less tortured by his anxiety." (Tr. 505). Plaintiff reported feeling a bit tired, but functional, and Dr. Guindon observed that he had a calmer mood with congruent affect. (Tr. 505).

On August 26, 2015, plaintiff reported to Dr. Stankus that he planned to live on his farm, raise fowl, get an apprenticeship working on airplanes in exchange for free flight time at the local airport, and complete his pilot's license. (Tr. 501). Plaintiff was taking Seroquel and Valium at the time. (Tr. 501). Dr. Stankus noted that plaintiff was very anxious, noticeably agitated, and broke down in tears during the session. (Tr. 502). Plaintiff also reported he could not tolerate the CPAP machine. (Tr. 502).

Plaintiff cancelled follow-up appointments with Dr. Stankus that were scheduled in September and October 2015. (Tr. 500). After the August 26, 2015 appointment, plaintiff did not receive any additional treatment until January 21, 2016, following his medical discharge form the Air Force in November 2015 and relocation to his home town in Missouri. (Tr. 911).

Throughout his psychiatric treatment with Drs. Guindon and Stankus, from October 2014 to August 2015, they noted his affect was of limited range and intensity,

5

congruent with reported depressed and anxious mood. (Tr. 515, 531, 540, 543, 546, 554, 572, 574, 578). At the same time, however, Dr. Guindon's findings showed normal attention, appearance, demeanor, behavior, psychomotor functioning, speech, memory, impulse control, overall cognition, thought process, thought content, insight, and judgment. (Tr. 556). His treatment records noted that plaintiff's attention, memory, overall cognition, impulse control, insight, and judgment were consistently normal. (Tr. 515, 521, 529, 534, 540, 543, 546-47, 556, 571-72, 574-75, 577-78).

Plaintiff consistently reported that medications caused side effects (Tr. 505, 519, 532, 545, 554, 576). Dr. Guindon prescribed, increased, decreased, and discontinued several medications over the course of plaintiff's treatment, including Klonopin, Ambien, Wellbutrin, Xanax, Luvox, Pamelor, Seroquel, Nortriptyline, and Valium, but plaintiff continued to experience symptoms of depression, anxiety, and PTSD. (Tr. 502, 515, 523, 526, 531, 537, 542, 559, 571, 574, 581).

In his function report dated November 16, 2015, plaintiff reported he stayed busy all day around the house and had no problem performing personal care. (Tr. 174). He reported he went outside daily, could travel by foot or car, went shopping once or twice a week, and went shooting every two weeks. (Tr. 176-77). He reported no problems with memory, completing tasks, concentrating, understanding, or following directions. (Tr. 178). He reported he could follow written and spoken instructions "very well" and could handle changes in routine. (Tr. 178-79).

In January 2016, plaintiff reported using his CPAP only occasionally or not at all. (Tr. 911, 917). From January to June 2016, Zachary Osborn, PhD, and Matthew Novak, PhD, observed that plaintiff's mood was depressed, anxious, and irritable. (Tr. 912, 915, 923, 940, 943). In March, May, and June 2016, Dr. Novak described plaintiff's mood as "anxious, concerned, and frustrated" but in many ways his behavior was normal. (Tr. 923, 940, 943). He displayed adequate grooming and casual dress, his speech was normal, and his behavior was unremarkable. (Tr. 923, 940, 943). Plaintiff's thought processes were linear and goal-directed and there was no evidence of thought disorder.

(Tr. 923, 940, 943). Plaintiff was advised to stop smoking for his pulmonary complaints, but he continued to do so. (Tr. 502, 515, 567, 741, 913, 932, 949, 1227).

At the hearing, in June 2016, plaintiff testified that he had stopped taking all of his medications. (Tr. 50). He testified that he kept busy living on his family's farmland doing things like repairing fences, maintaining vehicles, doing oil changes, mowing the property, and helping bail hay. (Tr. 47). He rode his dirt bike and went target shooting. (Tr. 49-50).

Rebecca Jalilov, plaintiff's girlfriend, testified on his behalf to the following. She has lived with plaintiff since October 2014. Plaintiff's mental health condition will get better eventually, but his current symptoms would prevent him from working now. This is exemplified by her need to accompany him when shopping at Walmart. Plaintiff cannot stand being around people for very long. She never accompanied plaintiff when he worked with his grandfather. When she and he visit with friends, it is at plaintiff's farm, not away from the farm. (Tr. 52-57).

Also, Vocational Expert Kathy Hudson testified to the following. VE Hudson classified plaintiff's prior work as a comptroller, which was primarily sedentary, but occasionally required heavy work.

The ALJ asked the VE to assume someone with plaintiff's age, education, education, and work experience "as they are performed at all exertional levels." (Tr. 58). The individual could understand, carry out, and remember simple work instructions and procedures. This person could also adapt to changes in work settings, which are simple, predictable, and can be easily explained. The individual was able to make simple work related decisions with occasional and superficial contact with co-workers, supervisors, and the public. (Tr. *id.*). The VE opined that the assumed individual could not perform any of plaintiff's past work. (Tr. 59).

The VE further testified, however, in response to the ALJ's question, that such a person could do unskilled work at a medium level of exertion. Such would be as a laundry laborer and as a copy machine operator. (Tr. 59).

The ALJ asked the VE a second hypothetical question, with slightly different assumptions. This person would perform work with things and data, instead of occasional and superficial contact with persons. The VE testified that such a person could also perform the work of a laundry laborer and a copy machine operator. (Tr. 59).

The ALJ asked the VE a third hypothetical question, which added to the second hypothetical person, the fact that the person would be off task more than 15 percent of the work period due to an inability to maintain concentration, persistence, and pace. The VE testified that the second hypothetical person with this added limitation could perform neither the work previously described nor any other work in the national economy. (Tr. 60).

Plaintiff's counsel asked the VE about an individual who has exhibited warning signs of homicidal and suicidal ideations of anger, insomnia, anxiety, and rage around people and who could not be around anyone, including at a workplace, for more than one hour per week. (Tr. 60-61). The VE testified that such an individual could not perform any competitive work. (Tr. 61).

B.  **ALJ's Decision**

The ALJ first found that plaintiff meets the insured status requirements of the Social Security Act through December 31, 2019. (Tr. 16). He found that plaintiff has not engaged in substantial gainful activity since his alleged onset date. (Tr. 16). He also found that plaintiff suffers from the severe impairments of depression, anxiety, and posttraumatic stress disorder. (Tr. 16). However, the ALJ concluded that none of these impairments, individually or in combination, met or equaled an impairment listed in the Commissioner's regulations. (Tr. 17).

The ALJ determined that plaintiff's impairments left him with the RFC to "perform a full range of work at all exertional levels," but with some nonexertional limitations. (Tr. 18). Specifically, the ALJ determined that plaintiff can understand, carry out, and remember simple work instructions and procedures; can adapt to changes in the work setting that are simple, predictable and can be easily explained; can make

simple work-related decisions; and should work with things and data, and not people, under normal supervision. (Tr. 18). In making this determination, the ALJ considered the objective medical evidence in the record, opinion evidence, and plaintiff's allegations and testimony. (Tr. 18-21).

The ALJ reasoned that the objective medical evidence did not substantiate plaintiff's allegations with regard to his mental impairments. (Tr. 19). The ALJ noted that plaintiff "has not received the type of treatment indicative of disabling conditions, and the objective evidence of record is inconsistent with allegations of total debilitation." (Tr. 19). The ALJ found that plaintiff's discharge from the Air Force for anxiety and depression appeared to have been due solely to job dissatisfaction. (Tr. 19). Plaintiff's mental status examinations revealed few objective abnormalities, and when he was on leave from work he did not feel medications were necessary. (Tr. 19). The ALJ stated that plaintiff "has not required any psychiatric hospitalization" and has "received no formal mental health treatment, but rather in fact he refuses counseling." (Tr. 19). The ALJ was unable to find any medical treatment records indicating that plaintiff has symptoms so severe he is unable to work, nor did any of plaintiff's treating providers opine that he was unable to work or had long-term or permanent restrictions. (Tr. 19-20).

The ALJ also found that plaintiff reported normal activities of daily living. (Tr. 20). He manages his own personal needs and hygiene, cares for pets, performs household chores and yard work, performs farm work, performs auto mechanic work, eats at a restaurant once a week, goes shopping, does building projects, spends time on his computer, plays video games, rides a dirt bike, goes for walks and hikes, helps his girlfriend with arts and crafts, handles his own finances, goes firearm shooting, maintains a successful relationship with his girlfriend, goes for jeep rides with 3-4 people at a time, and visits family. (Tr. 20). Plaintiff reported that he does "fine" or "very well" at following written and spoken instructions and handles changes in routine "well." (Tr. 20, 173-80, 246-53). Plaintiff reported he has a fear of crowds and people. (Tr. 20).

The ALJ gave great weight to the opinion of medical reviewer Margaret Sullivan, Ph.D., who opined that plaintiff was, at most, "'moderately' limited in an ability to

9

understand and remember detailed instructions, carry out detailed instruction work in coordination with or proximity of others without being distracted by them, and interact appropriately with the general public, and was 'not significantly limited' in the [remaining] categories involving mental functioning." (Tr. 20). Dr. Sullivan concluded that plaintiff

> can understand, remember and carry out simple instructions. He can generally relate appropriately to coworkers and supervisors in small numbers and for short periods of time. He can be expected to perform best in a work setting where he can complete tasks relatively independently and where social interaction is not a primary job requirement. He can make simple work related decisions. His ability to adapt to routine changes in the workplace is intact for most situations."

(Tr. 20, 65-76) (citing SSR 96-6p in giving Dr. Sullivan great weight).

The ALJ gave little weight, on the other hand, to the Department of Veterans' Affairs' determination that plaintiff is entitled to disability benefits, because VA disability benefits are awarded via a separate legal inquiry, which makes VA legal conclusions of little probative value in a social security proceeding. (Tr. 20-21).

Finally, the ALJ gave little weight to the testimony and reports of third parties in this case, finding they were similar to plaintiff's reports and added little information. (Tr. 20; 236-43, 282).

The ALJ concluded that plaintiff is unable to perform any past relevant work, but considering his age, education, work experience, and RFC, and relying on the testimony of a VE, determined there are jobs in significant numbers in the national economy that plaintiff could perform. (Tr. 21-22). Accordingly, the ALJ concluded that plaintiff was not disabled. (Tr. 22).

## II. **DISCUSSION**

Plaintiff argues that the ALJ erred: (1) in considering plaintiff's RFC, in that the ALJ made findings inconsistent with the substantial evidence of record; (2) by failing to fully develop the record; and (3) by failing to properly consider plaintiff's obstructive sleep apnea as a severe impairment at Step Two. (Doc. 18). The Court disagrees.

10

## A. General Legal Principles

In reviewing the denial of Social Security disability benefits, the court's role is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011).

To be entitled to disability benefits, a claimant must prove that he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 CFR § 404.1520(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). *Id.* § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the

11

Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

B. <u>**The ALJ Appropriately Determined Plaintiff's RFC**</u>

Plaintiff argues the ALJ's RFC determination is not supported by substantial evidence. Specifically, plaintiff argues that (1) the ALJ made an incorrect assumption related to plaintiff's treatment history, and (2) the ALJ failed to account for the substantial evidence proving plaintiff would be off task more than fifteen percent of the workday because of his impairments. (Doc. 18).

In assessing RFC, an ALJ must consider all of the relevant evidence, including "an individual's own description of his limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013). The ALJ must explain his assessment of the RFC with specific references to the record. SSR 96-8p (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion). Throughout this inquiry, the burden of persuasion to prove disability and to demonstrate RFC is on the claimant. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). In determining a claimant's RFC, the ALJ must rely on some medical evidence of plaintiff's abilities, but need not rely on a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

Plaintiff argues the ALJ incorrectly assumed that plaintiff refused counseling. (Tr. 19). The ALJ's decision discussed plaintiff's sporadic treatment history following plaintiff's discharge from the Air Force, concluding that "while the record does indicate the claimant has mental conditions, he has not received the type of treatment indicative of disabling conditions." (Tr. 18-19). The ALJ cited to a specific treatment record to support his statement that plaintiff refused counseling. This note is from Dr. Novak and was recorded in February 2016. (Tr. 916-17). Plaintiff had been discharged from the Air Force in November 2015, and he was self-reporting to Dr. Novak for treatment of PTSD. (Tr. 916). Dr. Novak's treatment notes are somewhat contradictory: Dr. Novak states

12

that "We will begin individual therapy, aimed at addressing his symptoms of irritability, anxiety and decreased motivation. I have requested a follow-up in about four weeks. He is scheduled to meet with Dr. Jamena to establish psychiatric care. He is aware of emergency resources. He agreed with this treatment plan." (Tr. 916). However, in two other sections Dr. Novak records that plaintiff declined psychiatric services and that "I have requested a follow-up in about four weeks. [Plaintiff] declined psychiatric care at this time." (Tr. 916).

The record shows that plaintiff did undergo counseling after Dr. Novak's report, which the ALJ discussed in his decision. (Tr. 19-20). The ALJ's statement that plaintiff refused counseling is, at most, harmless error. An error by the ALJ is harmless if the evidence is strong enough to support the outcome despite the error. *See Lubinski v. Sullivan*, 952 F.2d 214, 216 (8th Cir. 1991). There is substantial evidence to support the ALJ's broader conclusion that plaintiff's treatment history was conservative and routine. (Tr. 19). Plaintiff did not take any psychotropic medication at all in 2016. (Tr. 297). There is no evidence plaintiff ever received emergency treatment for his impairments. There was a significant gap in plaintiff's treatment, from August 2015 to January 2016, and although plaintiff had some explanation for this—he was discharged from the Air Force in November 2015, relocated, and had to find new providers—it was not unreasonable for the ALJ to find a significant gap in treatment to be inconsistent with disabling levels of psychiatric symptoms. *See Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015). A pattern of minimal or conservative treatment weighs against allegations of disabling impairments. *Milam v. Colvin,* 794 F.3d 978, 985 (8th Cir. 2015).

Substantial evidence supports the ALJ's determination of plaintiff's mental RFC, and the evidence is inconsistent with a finding of greater limitations. The ALJ agreed that plaintiff's depression, anxiety, and PTSD were all severe impairments, but he found that these impairments simply did not give plaintiff disabling functional limitations. The mental status findings throughout he record support this conclusion: although plaintiff occasionally presented with limited affect, depressed mood, and some agitation, or reported anxiety and frustration, the other mental status findings showed normal

attention, appearance, demeanor, behavior, psychomotor functioning, speech, memory, impulse control, cognition, thought process, thought content, insight, and judgment. (Tr. 515, 521, 529, 534, 540-41, 543, 546-47, 556, 568, 571-72, 574-75, 577-78). None of plaintiff's treating providers imposed long-term functional limitations on plaintiff. (Tr. 20). As the ALJ noted, plaintiff's primary complaints related to job dissatisfaction. (Tr. 951, 954, 958, 971, 976, 980, 996, 1007, 1011, 1017, 1026, 1033, 1039, 1064, 1214, 1226). He took medication to cope with work and then stopped taking medication when he was on vacation and once he left the Air Force. (Tr. 297, 992, 1002). Plaintiff's activities of daily living also do not support limitations greater than the ones the ALJ imposed. Plaintiff reported keeping busy on his family farm by repairing fences, maintaining vehicles, doing oil changes, mowing the property, bailing hay, riding his dirt bike, and going target shooting. (Tr. 47, 49-50). Plaintiff reported that he lives with and maintains a good relationship with his girlfriend, takes care of pets, stays busy all day around the house, has no problem performing personal care, goes outside daily, travels by foot or car, and goes shopping once or twice a week. (Tr. 174, 176-77).

Plaintiff further argues that the ALJ's RFC determination should have included the limitation that he would be off task at least 15 percent of the time. Although it is ultimately the ALJ's responsibility to formulate the RFC, the burden is on the plaintiff to establish his limitations. *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016). In support of his claim that he would be off task at least 15 percent of the time every day, plaintiff cites his own subjective complaints. (Doc. 18). "An ALJ may decline to credit a claimant's subjective complaints if the evidence as a whole is inconsistent with the claimant's testimony." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016). The mental status examination results in the record consistently show that plaintiff's attention, thought process, and impulse control are normal. (Tr. 497, 502, 515, 520-21, 529, 533-34, 540, 542-43, 546-47, 556). No medical source indicated plaintiff had any limitations related to staying on task.

The court concludes that the ALJ properly considered all relevant medical evidence, including plaintiff's own description of his limitations, and incorporated into

the decision the observations of plaintiff's treating physicians and the opinion of the state-agency physician who reviewed plaintiff's records. *See McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003). The ALJ relied on treatment and examining records, objective medical evidence, consultative examination reports, plaintiff's statements to physicians, and plaintiff's disability application materials in determining plaintiff's RFC. (Tr. 16-24). Plaintiff has not shown that more severe limitations are required, and he bears this burden at Step Four. Substantial evidence supports the weight the ALJ assigned to the evidence.

### C. ALJ Appropriately Developed the Record

Plaintiff makes the related argument that the ALJ failed to fully and fairly develop the record, but this argument fails. An ALJ has the duty to develop the record independent of the claimant's burden in the case. *Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004). Again, however, the burden of persuasion to prove disability and to demonstrate RFC remains on the claimant. *Id.* Plaintiff has not identified any information that the ALJ should have had in making his decision. The evidence of record here was sufficient for the ALJ to determine that plaintiff had not met the burden of proving disability. As detailed above, the ALJ thoroughly discussed the treatment record, the objective medical evidence, plaintiff's and other witness' statements, and a consultative examination report. "In the absence of medical opinion evidence, medical records prepared by the most relevant treating physicians can provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." *Hensley*, 829 F.3d at 932 (citations omitted). In this case, the ALJ looked to medical records describing plaintiff's many normal mental abilities, with no physicians placing significant workplace limitations on plaintiff.

Here, no crucial issue was left undeveloped; rather, plaintiff simply failed to show that he has limitations greater than those set out by the ALJ. Plaintiff did not prove that the significant mental limitations set out in the RFC would not address his impairments. Accordingly, it was not error for the ALJ to render a decision based on the record alone,

without re-contacting plaintiff's treating physician or ordering a consultative examination. *See Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (holding that treatment records alone can provide medical evidence supporting RFC).

D.     **The ALJ Properly Determined Plaintiff's Severe Impairments at Step Two**

Plaintiff also argues that the ALJ erred in finding that plaintiff's obstructive sleep apnea was not a severe impairment. (Tr. 17). Plaintiff argues that the ALJ failed to recognize the difference between refusing prescribed treatment and the inability to tolerate prescribed treatment. Plaintiff further complains that the ALJ had a duty to ask plaintiff whether he had any work-related limitations from sleep apnea, insomnia, or poor sleep. (Tr. 18).

At Step Two of the sequential evaluation process, the ALJ must evaluate the claimant's "severe" impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one that significantly limits a claimant's ability to do work-related activities. 20 C.F.R. § 404.1520(c). An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). The impairment must also be expected to result in death, or have lasted, or be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509. The severity standard is not an onerous one; but it is not a toothless standard either. *Kirby*, 500 F.3d at 708. The Eighth Circuit has upheld the Commissioner's finding that a claimant has failed to prove that an impairment is severe. *Id.*; *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001). The burden of proving a severe impairment is on the claimant. *Kirby*, 500 F.3d at 707-08.

Applying this standard, the record contains substantial evidence that plaintiff's sleep apnea was not severe. The ALJ discussed several factors in his decision that contributed to his conclusion that sleep apnea was not a severe impairment. (Tr. 17).

First, the ALJ considered plaintiff's failure to follow the recommended course of treatment for his sleep apnea to weigh against his subjective complaints of fatigue. *See*

16

*Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016). Although plaintiff was prescribed a CPAP machine to control his sleep apnea, he did not use it. (Tr. 17). He reported he had trouble keeping the mask on and was urged to keep trying because he could not become accustomed to it unless he wore it consistently. (Tr. 695). When a doctor prescribed plaintiff medication to help him sleep with the mask, plaintiff reported that his sleep improved and he was getting 6 to 7 hours of sleep a night. (Tr. 574-76). However, plaintiff reported in January 2016 that he used his CPAP only occasionally or not at all, and he stopped taking all of his medications by June 2016. (Tr. 50, 911, 917). Additionally, plaintiff was advised to stop smoking for his pulmonary complaints, but he continued to do so. (Tr. 502, 515, 567, 741, 913, 932, 949, 1227).

Second, the ALJ noted that plaintiff testified that his mental impairments and mood swings were the impairments preventing him from working. (Tr. 17, 42). Plaintiff never implicated his sleep apnea as something that limited his ability to perform work-related activities. This is consistent with records from the Department of Veterans Affairs indicating that plaintiff's sleep apnea did not result in work-related limitations. (Tr. 369). At the hearing, plaintiff was asked what impairments he believed precluded him from working, and he never mentioned his sleep apnea in response. (Tr. 42-44).

The ALJ therefore relied on substantial evidence in concluding that plaintiff's sleep apnea did not result in significant work-related limitations. Even if a different factfinder might have made a different Step Two determination, that is insufficient to reverse the ALJ's decision, as long as substantial evidence supports the ALJ's determination. *See Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017).

### III. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 21, 2018.